UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: _1/30/2020_

---

DANIEL WILLIAMS,

        Plaintiff,

        v.

NEW YORK CITY DEPARTMENT OF
CORRECTION; CITY OF NEW YORK;
JOHN DOES 1-10, *in their individual and
official capacities,*

        Defendants.

No. 19-CV-5200 (RA)

MEMORANDUM OPINION
& ORDER

---

RONNIE ABRAMS, United States District Judge:

    Plaintiff Daniel Williams brings this action against Defendants New York City

Department of Correction ("DOC"), the City of New York, and ten John Doe Defendants in their

individual and official capacities. Plaintiff alleges claims of discrimination under federal and

state law. Before the Court is Defendants' motion to dismiss. For the following reasons, the

motion is granted.

## BACKGROUND[1]

    Plaintiff, an African American male, was a correction officer at DOC from January 2014

or 2016 to February 2018.[2] During this period, he was assigned to work at the Manhattan

Detention Complex (the "MDC"). He alleges that he was subject to race discrimination and

retaliation, resulting ultimately in his termination, following an incident in March 2017.

---

[1] The Court draws the following facts from Plaintiff's complaint, *see* Dkt. 1, and for the purposes of this motion, accepts them as true. *See Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007).

[2] The complaint states that Plaintiff began to work for DOC both in January 2014 and January 2016. *See* Compl. ¶¶ 9, 16. Plaintiff's opposition then states that he began to work for DOC in January 2016, *see* Pl.'s Opp. at 2, whereas Defendants' motion says he began in January 2014, *see* Defs.' Mot. at 3. Although this fact is unclear based on the complaint and briefing, it has no bearing on the outcome of this motion.

On March 24, 2017, Plaintiff alleges that he and several other correction officers, who were all white, were ordered by a Captain Ellerbe to move Taiwan Heath, a man detained at the MDC, into his cell. According to Plaintiff, once Heath was in his cell, "Captain Ellerbe sprayed Heath with Oleoresin Capsicum, also known as pepper spray." Compl. ¶ 20. The next day, Plaintiff observed that Heath remained in his cell "contaminated with pepper spray." *Id.* ¶ 21. Plaintiff allegedly reported this to Captains Black and Ingram, telling them "that he had never seen a white inmate treate[d] in this same manner." *Id.* ¶ 22. He also alleges that he was the only correction officer to report this incident.

In April 2017, Captain Firsov contacted Plaintiff "to fill out a 'use-of-force allegation' form" regarding the March 24, 2017 incident. *Id.* ¶ 23. Plaintiff complied with that request.[3] Several months later, on July 13, Plaintiff was ordered to meet with DOC's Investigation Division to discuss the March 24, 2017 incident. Plaintiff insists that, during the interview, he "steadfastly asserted that he submitted the required forms upon being ordered by his superiors and steadfastly asserted that [he] did not use force on Heath." Compl. ¶ 25.

Following the interview, Plaintiff asserts that he "became the subject of aggressive but baseless investigations and meritless departmental charges," resulting in his termination on February 15, 2018. *Id.* ¶ 31. According to Plaintiff, when he asked Captain Green why he was fired, Captain Green responded, "I don't know." *Id.* ¶ 27.

Plaintiff now alleges that "race and retaliation [w]as the motivating factor in their filing and sustaining baseless charges against Plaintiff and eventually firing Plaintiff." *Id.* ¶ 37; *see also id.* ¶ 44 ("Defendant has discriminated against Plaintiff on the basis of his race and sex and

---

[3] The complaint refers to two exhibits: Exhibit B, an e-mail showing Captain Firsov's request for Plaintiff to fill out the form, and Exhibit C, Plaintiff's completed use-of-force form. *See id.* ¶ 23. Neither exhibit, however, was attached to the complaint. *See* Dkt. 1; *see also* Defs.' Mot. at 3 n.2 ("The Complaint fails to annex plaintiff's report as Exhibit 'C,' as stated.").

retaliated against Plaintiff for speaking out against CORRECTIONS's inhumane and discriminatory practices."). He notes that he was allegedly both the only African American correction officer involved in the March 24, 2017 incident and the only officer among that group to be fired. He also more broadly alleges that DOC has a practice and policy of race discrimination. He contends, for instance, that "no white or male officer of CORRECTIONS has ever been fired" or "faced departmental charges for reporting an unsafe inmate condition." *Id.* ¶¶ 35-36. He further asserts that "the entire investigation and disciplinary system within the CORRECTIONS is a mechanism through which discrimination based on color, sex, race and national origin is perpetuated," and "[t]his pattern of racial and sexual discriminatory conduct by CORRECTIONS is so rampant and blatant that supervising officers of the CORRECTOINS are afraid to confront the culture of racism and retaliation." *Id.* ¶¶ 40-41.

In March 2018, Plaintiff asked the Equal Employment Opportunity Commission (the "EEOC") to bring charges against DOC in connection with his termination. On March 13, 2019, the EEOC issued Plaintiff a right-to-sue letter. *See* Dkt. 1, Ex. A. Plaintiff subsequently filed this action on June 3. On August 5, Defendants filed the present motion to dismiss, which Plaintiff opposed on August 25. Defendants did not file a reply brief.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In reviewing a motion to dismiss, the Court "constru[es] the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Goldstein v. Pataki*, 516 F.3d 50, 56 (2d Cir. 2008). The Court, however, need not credit "[t]hreadbare

recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678.

## DISCUSSION

Plaintiff alleges violations of federal law under Title VII, 42 U.S.C. § 1983, and 42 U.S.C. § 1981, as well as violations of New York state and municipal law. The Court addresses these claims in turn.

## I. Title VII Claims

Plaintiff alleges discrimination, retaliation, and hostile work environment on the basis of race in violation of Title VII.[4] The Court considers each of these claims as to DOC and the City.[5] For the reasons provided below, the Court concludes that none plausibly state a claim for relief.

### A. Timeliness

As an initial matter, Plaintiff timely brought his Title VII claims. "Plaintiff alleges that his unlawful and discriminatory termination" – here, the adverse action – "occurred in February of 2018." Pl.'s Opp. at 7. One month later, he filed an EEOC charge. Plaintiff's Title VII claims thus accrued less than 300 days prior to the date of his EEOC filing, as is statutorily required. *See* 42 U.S.C. § 2000e-5(e)(1).

To the extent that Plaintiff's claims require consideration of the March 24, 2017 incident and the events between that incident and Plaintiff's termination in February 2018, the Court may

---

[4] At several points, the complaint also references discrimination based on sex. *See, e.g.*, Compl. ¶ 44. Plaintiff, however, does not substantiate that claim with any particular factual allegations nor does he argue in his opposition that he was subject to sex discrimination.

[5] The complaint does not specify against which Defendant Plaintiff brings his Title VII causes of action. *See id.* ¶¶ 64-66, 67-69. To the extent that Plaintiff brings those claims against the individually named Defendants, however, those claims must be dismissed because "Title VII claims are not cognizable against individuals[.]" *Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 226 (2d Cir. 2004).

still consider them pursuant to "[t]he continuing violation exception to the Title VII limitations periods." *Patterson*, 375 F.3d at 220. "[I]f a Title VII plaintiff files an EEOC charge that is timely as to any incident of discrimination in furtherance of an ongoing policy of discrimination, all claims of acts of discrimination under that policy will be timely even if they would be untimely standing alone." *Id.* ("[A] plaintiff must at the very least allege that one act of discrimination in furtherance of the ongoing policy occurred within the limitations periods.").

## B. Discrimination

Plaintiff alleges that "Defendant[s] ha[ve] discriminated against [him] on the basis of his race[.]" Compl. ¶ 44. He states that, "[p]rior to his termination, [he] became the subject of aggressive but baseless investigations and meritless departmental charges" and that "race . . . [w]as the motivating factor" for those actions. *Id.* ¶¶ 31, 37. To support this claim, Plaintiff asserts that he was both the only African American officer among those involved in the March 24, 2017 incident and the only one to be fired. He also more broadly alleges that no white officers have ever faced similar charges or been fired for reporting a comparable incident. This, he claims, reflects a "pattern of racial . . . discriminatory conduct," particularly within DOC's "entire investigation and disciplinary system." *Id.* ¶¶ 40-41.

To make a *prima facie* case of discrimination under Title VII, Plaintiff must show "(1) that []he is a member of a protected class, (2) that []he was qualified for the position []he sought, (3) that []he suffered an adverse employment action, and (4) [that he] can sustain a *minimal* burden of showing facts suggesting an inference of discriminatory motivation." *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015).

Even assuming that Plaintiff could satisfy the first three elements of this analysis, his claim fails because Plaintiff has proffered no facts to support a plausible allegation that

Defendants' conduct was motivated by discriminatory intent.[6] Alleging no direct evidence of discrimination, the complaint states only that Plaintiff was the subject of investigations and charges. *See* Compl. ¶ 31. However, it nowhere explains what the substance of those investigations was or even when they took place. Nor does Plaintiff state what charges or discipline he received after the March 24, 2017 incident and prior to his February 2018 termination, even though this information should be readily available to him at this stage.

Moreover, the complaint offers nothing but speculation that race played a role in the alleged investigations, charges, and his eventual termination. Plaintiff's single arguably non-conclusory contention is that he was the only African American officer fired among the officers present during the March 24, 2017 incident. But Plaintiff's attempt to ground his Title VII discrimination claim on a theory of disparate treatment also fails. Pl.'s Opp. at 13 ("Plaintiff alleges facts of indirect discrimination through the treatment []he experienced as compared to similarly situated white male employees."). "[S]howing that the employer subjected him to disparate treatment, that is, treated him less favorably than a similarly situated employee outside his protected group" is a permissible means of establishing an inference of discriminatory motivation. *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000); *see also Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 254 (E.D.N.Y. 2012) (explaining that disparate treatment "is a recognized method of raising an inference of discrimination for purposes of making out a *prima facie* case"). In relying on this theory, however, a plaintiff must identify comparators and show that the comparators are "'similarly situated in all material respects' to the individuals with

---

[6] Defendants do not seem to dispute that Plaintiff plausibly alleges a material adverse action – that is, his termination in February 2018. *See* Defs.' Mot. at 6 ("Aside from his allegedly retaliatory termination, the Complaint does not plead that Plaintiff suffered an adverse employment action."); *see also Littlejohn*, 795 F.3d at 312 n.10 ("Examples of materially significant disadvantages" – constituting an adverse employment action – "include termination[.]").

whom she seeks to compare herself." *Graham*, 230 F.3d at 39-40 (requiring "a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases"); *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 96 (2d Cir. 1999) (necessitating that "the plaintiff must compare herself to employees who are 'similarly situated in all material respects,'" which includes "be[ing] subject to the same standards governing performance evaluation, discipline, and must have engaged in conduct similar to the plaintiff's").

Here, the complaint contains nothing of the sort. Plaintiff alleges disparate treatment by arguing that he was the only African American officer fired among those involved in the March 24, 2017 incident. Then, more generally, he asserts that DOC has a policy and practice of more severely disciplining and firing minority officers. For instance, the complaint states that "Plaintiff notices that while employed at CORRECTIONS, when black employees of CORRECTIONS are charged or accused with the same conduct as similarly situated white employees of CORRECTIONS, black employees of CORRECTIONS are dealt much harsher disciplinary consequences." Compl. ¶ 46; *see also id.* ¶ 47 ("This is evidenced by the many various cases of black employees being disciplined by CORRECTIONS and necessitating the hiring of independent counsel to have their grievances remedied.").

Beyond these conclusory allegations of disparate treatment, however, the complaint does not identify a single other correction officer, let alone one who was "similarly situated in all material respects'" to Plaintiff. *Graham*, 230 F.3d at 39. Most apparently, although Plaintiff alleges that he was the only African American officer among those who participated in the March 24, 2017 incident, he does not identify the other officers present that day by name or describe their race or position within DOC. "Where a plaintiff seeks to derive an inference of discrimination from allegations of disparate treatment, he or she must plausibly allege the

existence of at least one comparator who was more favorably treated despite being 'similarly situated to the plaintiff in all material respects.'" *Haggood v. Rubin & Rothman, LLC*, No. 14-CV-34, 2014 WL 6473527, at *11 (E.D.N.Y. Nov. 17, 2014); *see also Albert v. Carovano*, 851 F.2d 561, 572 (2d Cir. 1988) ("The naked allegation that appellees 'selectively enforc[ed] the College rules . . . against plaintiffs. . . because they are black [or] Latin' is too conclusory to survive a motion to dismiss."). The lack of support for Plaintiff's theory is further evident from his opposition brief, where he argues that he has sufficiently demonstrated discriminatory motivation through indirect evidence but neither cites nor mentions a fact alleged in the complaint. *See* Pl.'s Opp. at 13-14.

In sum, Plaintiff's claim of race discrimination, "generously construed, [is] little more than conclusory statements of no probative value" and must be dismissed. *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 65 (2d Cir. 1997).

### C. Retaliation

Plaintiff also alleges that Defendants retaliated against him for reporting the March 24, 2017 incident and, in particular, stating "that he had never seen a white inmate treat[ed] in this same manner." Compl. ¶ 22. "Retaliation claims under Title VII . . . are . . . analyzed pursuant to Title VII principles." *Littlejohn*, 795 F.3d at 315. "To establish a presumption of retaliation at the initial stage of a Title VII litigation, a plaintiff must present evidence that shows '(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action.'" *Id.* at 315-16. The protected activity must be the but-for cause of the alleged adverse action. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 ("Title VII retaliation claims must be proved according to traditional principles of but-for causation[.]").

Again, even if the Court assumes *arguendo* that Plaintiff has established the first three requirements in this analysis, the fourth – but-for causation between Plaintiff's reporting of the March 24, 2017 incident and his termination – is not plausibly alleged. *See Hollander v. Am. Cyanamid Co.*, 895 F.2d 80, 85 (2d Cir. 1990) (holding that, despite satisfying the first three elements of Title VII retaliation, the requisite causal nexus was not shown and thus plaintiff's claim fails).

Plaintiff has not put forth any direct evidence that his termination was a result of reporting the March 24, 2017 incident. Although he asserts that he was subject to "baseless investigations and meritless departmental charges" after the reporting, he alleges nothing else regarding those investigations and charges to plausibly connect them to his protected activity. Compl. ¶ 31. To accept Plaintiff's allegations would thus require the Court to speculate about any potential connection, which the Court cannot do.

The indirect evidence alleged also fails to support an inference of but-for causation. Although the Second Circuit "has consistently held that proof of causation can be shown . . . indirectly, by showing that the protected activity was followed closely by discriminatory treatment," *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000), here the proximity of time between the protected activity and the adverse action does not suffice. Plaintiff alleges that he reported the incident on March 25, 2017, complied with Captain Firsov's request to fill out the use-of-force form in April 2017, and then was interviewed about the incident in July 2017. Plaintiff, however, was not terminated until February 2018, approximately one year after first reporting the incident. While there is no "bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship," *Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cty.*, 252 F.3d 545, 554 (2d Cir. 2001), "temporal

proximity must be close," *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (per curiam). One year is far beyond what courts in this circuit have determined as temporally close. *See, e.g., id.* at 273-74 (citing cases in which courts found that three and four month gaps between the protected activity and adverse action were insufficient to establish causal connection). And even if the Court were to consider the time from Plaintiff's last alleged discussion about the incident – that is, his interview about the incident in July 2017 – and his termination, that would constitute six months – a period still too lengthy to infer causation.

Accordingly, without plausibly alleging causation, Plaintiff's Title VII retaliation claim has not crossed "the line from conceivable to plausible" and will be dismissed. *Twombly*, 550 U.S. at 570.

### D. Hostile Work Environment

To plead a hostile work environment under Title VII, Plaintiff must demonstrate that "the workplace [was] permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal citation omitted). "In determining whether the conduct was sufficiently severe or pervasive, courts look at '(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether the conduct was physically threatening or humiliating, or a mere offensive utterance; (4) whether the conduct unreasonably interfered with plaintiff's work; and (5) what psychological harm, if any, resulted.'" *Sotomayor*, 862 F. Supp. 2d at 260-61 (quoting *Aulicino v. N.Y.C. Dep't of Homeless Servs.*, 580 F.3d 73, 82 (2d Cir. 2009)). "A jury must be able to conclude that the work environment both objectively was, and subjectively was perceived by the plaintiff to be, sufficiently hostile to alter the conditions of employment for the worse." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 604 (2d Cir. 2006).

Plaintiff alleges that, prior to his termination in February 2018, he was "the subject of aggressive but baseless investigations and meritless departmental charges." Compl. ¶ 31. He "maintains that these disciplinary actions were the result of CORRECTIONS's attempt to create a racially hostile work environment for black employees." *Id.* ¶ 47. Nonetheless, the complaint includes insufficient factual matter about Plaintiff's workplace conditions and, as previously noted, inadequate detail about the alleged investigations and charges that Plaintiff was subjected to. To evaluate such a claim, the Court must "look[] at all the circumstances." *Harris*, 510 U.S. at 23. But Plaintiff provides no detail about his work circumstances for the Court to evaluate. There are no facts alleged as to when the investigations took place and why, what he was charged with and why, or other alleged severe and/or pervasive conduct that Plaintiff may have faced. Plaintiff's opposition also offers no defense to the motion to dismiss, stating only that this claim is established "based upon the above-mentioned isolated and collective conduct of defendants' CITY OF NEW YORK AND JOHN DOES 1-10." Pl.'s Opp. at 14. The Court therefore finds no plausible allegation in the complaint that Plaintiff was subjected to harassment, let alone the frequent and severe harassment necessary to support a hostile work environment claim.[7]

## II. Section 1981 and 1983 Claims

Plaintiff also brings First, Thirteenth, and Fourteenth Amendment claims pursuant to 42 U.S.C. §§ 1981 and 1983.

---

[7] In addition, "[i]t is axiomatic that mistreatment at work, whether through subjection to a hostile environment . . . is actionable under Title VII only when it occurs because of an employee's . . . *protected characteristic.*" *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 (2d Cir. 2014). But for reasons previously given in discussing his other Title VII claims, Plaintiff has not plausibly alleged that Defendants' actions were motivated by his race.

## A. *Monell* Claims

As a preliminary matter, the Court dismisses Plaintiff's § 1981 and § 1983 claims against DOC and the City. "[W]hen the defendant sued for discrimination under § 1981 or § 1983 is a municipality . . . the plaintiff is required to show that the challenged acts were performed pursuant to a municipal policy or custom." *Patterson*, 375 F.3d at 226; *see Nieblas-Love v. N.Y.C. Hous. Auth.*, 165 F. Supp. 3d 51, 75 (S.D.N.Y. 2016) (applying *Monell* liability to a municipal agency). Thus, the same liability inquiry under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), applies to both the § 1981 and § 1983 claims brought against DOC and the City here. *See Patterson*, 375 F.3d at 226. *Monell* liability is established by showing: "(1) a formal policy which is officially endorsed by the municipality; (2) actions taken or decisions made by government officials responsible for establishing municipal policies which caused the alleged violations of the plaintiff's civil rights; (3) a practice so persistent and widespread that it constitutes a 'custom or usage' and implies the constructive knowledge of policy-making officials; or (4) a failure by official policy-makers to properly train or supervise subordinates to such an extent that it amounts to deliberate indifference to the rights of those with whom municipal employees will come into contact." *Moray v. City of Yonkers*, 924 F. Supp. 8, 12 (S.D.N.Y. 1996) (internal citations omitted). Liability cannot be premised on a theory of *respondeat superior*. *See Reynolds v. Giuliani*, 506 F.3d 183, 191 (2d Cir. 2007).

Here, Plaintiff makes only generalized and conclusory allegations about DOC's and the City's role in this alleged misconduct. For instance, the complaint states that there was a "pattern of racially discriminatory conduct," Compl. ¶ 45; a "pattern of inequity and racial discrimination," *id.* ¶ 48; a "policy and practice to retaliate against officers who complained of discrimination," *id.* ¶ 59; "the policy and practice of defendants to institute formal

Administrative Charges against individuals who file grievances against defendants and/or who break the blue wall of silence," *id.* ¶ 61; and "the policy and practice of defendants to discipline minority officers in a more severe manner than non-minority officers," *id.* ¶ 62.

While "a plaintiff 'is not obliged to plead evidence supporting his allegations of the existence of a custom or policy that allegedly caused the injury in question," "[t]his does not permit Plaintiff to rely only on a conclusory allegation of an unconstitutional policy." *Ambrose v. City of New York*, 623 F. Supp. 2d 454, 465 (S.D.N.Y. Mar. 31, 2009). Plaintiff does not even suggest, for example, which "official or officials [would be] responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986). Thus, without providing more than "boilerplate allegations of unconstitutional policies and practices," *Plair v. City of New York*, 789 F. Supp. 2d 459, 469 (S.D.N.Y. 2011), and "[n]o factual matter of any kind accompan[ying] plaintiff's rote recitation of *Monell*," *Abreu v. City of New York*, 657 F. Supp. 2d 357, 361 (E.D.N.Y. 2009), his § 1981 and § 1983 claims against DOC and the City must be dismissed. The Court's ensuing analysis, therefore, considers only those claims as to the individual John Doe Defendants.

### B. First Amendment Retaliation Claim

Plaintiff next alleges that Defendants retaliated against him in violation of the First Amendment. Although the complaint does not clearly delineate what speech allegedly spurred Defendants' retaliation, Plaintiff seems be referring to his reporting of the March 24, 2017 incident, as well as his completion of the use-of-force form in April and interview with the Investigation Department in July. He alleges that, as a result of his reporting, he was "subject[ed] ... to extra scrutiny, the initiation of retaliatory investigations, demotions via transfer, retaliatory prosecution of baseless disciplinary proceedings and threats of penalties." Compl. ¶ 54. Plaintiff further alleges that DOC has an "unwritten" policy, known as the "Blue

wall of silence," which restrains officers from reporting other officers for misconduct and subjects those who do to administrative charges. *Id.* ¶ 60.

To plead a First Amendment retaliation claim, Plaintiff must show that "(1) the speech at issue was 'made as a citizen on matters of public concern rather than as an employee on matters of personal interest,' (2) he or she suffered an adverse employment action, and (3) 'the speech was at least a substantial or motivating factor in the [adverse employment action].'" *Garcia v. Hartford Police Dep't*, 706 F.3d 120, 129-30 (2d Cir. 2013) (internal citations omitted). As to the first requirement, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communication from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006).

Plaintiff fails to state a claim for First Amendment retaliation because his speech was made pursuant to his official duties and not as a private citizen. *See Jackler v. Byrne*, 658 F.3d 225, 237 (2d Cir. 2011) ("Whether the employee spoke solely as an employee and not as a citizen is . . . largely a question of law for the court."). The Supreme Court has defined speech made "pursuant to" official duties as "speech that owes its existence to a public employee's professional responsibilities." *Garcetti*, 547 U.S. at 421. Even "where no clear 'official duty' to speak is present on the record, this Circuit focuses on the subject, manner, and context of the speech to determine whether it relates to topics that are 'indispensable prerequisites to effective' performance of the speaker's 'primary employment responsibility,' and thus not entitled to First Amendment protection." *Griffin v. City of New York*, 880 F. Supp. 2d 384, 396 (E.D.N.Y. 2012). Whether speech is pursuant to official duties is an "objective" and "practical" inquiry.

*See Weintraub v. Bd. of Educ. of City Sch. Dist. of City of New York*, 593 F.3d 196, 202 (2d Cir. 2010).

Primarily at issue here is Plaintiff's report to Captains Black and Ingram that, one day after placing Heath in his cell, he "observed Heath . . . [still] contaminated with pepper spray" and "that he had never seen a white inmate treat[ed] in this same manner." Compl. ⁋ 21-22. This speech is directly tied to Plaintiff's "professional responsibilities" as a correction officer at the MDC. *Garcetti*, 547 U.S. at 421. This is perhaps best illustrated by the fact that Plaintiff participated – in his role as a correction officer at the MDC – in the very incident that he reported. Moreover, Plaintiff admits that his supervisors ordered him to complete the use-of-force form and conduct the interview. *See* Compl. ⁋ 25 ("Plaintiff steadfastly asserted that he submitted the required forms upon being ordered by his superiors[.]"); *id.* ⁋ 26 (stating that the firing was made "recklessly and with complete disregard for the actual facts" because Plaintiff "reported the incident as instructed by his superiors"). In light of this, the Court cannot conclude that Plaintiff's speech was anything but a "primary employment responsibility of his," *Griffin*, 880 F. Supp. 2d at 396, in large part because the treatment of those detained at the MDC was "part-and-parcel of [Plaintiff's] concerns" as a correction officer, *Weintraub*, 593 F.3d at 203. *See also Lee-Walker v. N.Y.C. Dep't of Educ.*, 220 F. Supp. 3d 484, 492 (S.D.N.Y. 2016) (holding that a public school teacher's statements were pursuant to her official duties because they "were made to [her] own students at school, during class, concerning a topic that [s]he alleges s[he] believed to be of important to their continuing education"); Defs.' Mot. at 15 (explaining that reporting the treatment of a detainee was "attendant to [Plaintiff's] role as a probationary correction officer").

Plaintiff disputes this, asserting that the "reporting of discrimination and misconduct by Defendants was not part of his official duties." Pl.'s Opp. at 17; *see also id.* ("Reporting internal misconduct to Investigators was neither encouraged nor rewarded and was not expected or permitted[.]"). This argument lacks merit, however, in light of the Second Circuit's admonition that "speech can be 'pursuant to' a public employee's official job duties even though it is not required by, or included in, the employee's job description, or in response to a request by the employer." *Weintraub*, 593 F.3d at 203; *see also Garcetti*, 547 U.S. at 422 ("Employers have heightened interests in controlling speech made by an employee in his or professional capacity."). Plaintiff relies heavily on a single case from the Eastern District of New York, *Griffin v. City of New York*, 880 F. Supp. 2d 384 (E.D.N.Y. 2012), which held that a police officer, who reported misconduct to the New York Police Department's Internal Affairs Bureau, spoke as a private citizen. *See* Pl.'s Opp. at 17. *Griffin* is inapposite in several respects, most critically because there the court noted that the speech was unrelated to the plaintiff's actual assignments as a police officer. *See Griffin*, 880 F. Supp. 2d at 398 ("[The] alleged misconduct did not directly interfere with plaintiff's ability to perform his assigned duties as a police officer."). By contrast, here, Plaintiff admits that "Captain Ellerbe ordered [him] and several other officers" to participate in the incident from which the reporting followed. Compl. ¶ 19.

Plaintiff also attempts to argue that "[e]xposure of official misconduct, especially within law enforcement, is generally of great consequence to the public, and thus is a topic that is a matter of public concern for First Amendment purposes." Pl.'s Opp. at 18. While that may well be true, "whether the subject of the employee's speech was a matter of public concern" and "whether the employee spoke 'as a citizen' rather than solely as an employee" are divided into "two inquiries." *Jackler*, 658 F.3d at 235. The case law is, therefore, clear that the Court's

analysis ends upon finding that Plaintiff's speech was made in accordance with his employment responsibilities as a correction officer.[8]

## C. Fourteenth Amendment Claim

Plaintiff also brings a cause of action under the Fourteenth Amendment, which – although somewhat unclear – seems to allege a violation of the Equal Protection Clause. A Fourteenth Amendment equal protection claim is analyzed under the same framework as Title VII claims. *See Ruiz v. County of Rockland*, 609 F.3d 486, 491-92 (2d Cir. 2010); *see also Williams v. N.Y.C. Dep't of Educ.*, No. 19-CV-1353 (CM), 2019 WL 4393546, at *15 (S.D.N.Y. Aug. 28, 2019) ("[A]n equal protection claim 'parallels [a] Title VII claim[.]'" (citation omitted)). Plaintiff, therefore, "must first establish a *prima facie* case of discrimination." *Ruiz*, 609 F.3d at 491. To the extent that Plaintiff is alleging a selective enforcement theory, this "requires a showing that (1) 'compared with others similarly situated, [the plaintiff] was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure [the plaintiff]." *DePrima v. City of N.Y. Dep't of Educ.*, No. 12-CV-3626, 2014 WL 1155282, at *5 (E.D.N.Y. Mar. 20, 2014).

Plaintiff alleges that "Defendant CORRECTIONS, acting under color of law and pursuant to their official policy, practice or custom, intentionally, knowingly and/or with deliberate indifference for the rights of Plaintiff, discriminated against him when they filed and

---

[8] As an additional note, "[a]n individual may be held liable under . . . § 1983 only if that individual is personally involved in the alleged deprivation." *Littlejohn*, 795 F.3d at 314. Although Plaintiff names ten John Does as defendants, he does not include any specific allegations as to how those Defendants – even if he could not identify them by name – were involved in this alleged conduct.

sustained frivolous charges against Plaintiff and failed to promote Plaintiff to Detective on the basis of his race."[9] Compl. ¶ 85. But only alleging that frivolous charges were brought against him is insufficient to state a claim for relief under the Fourteenth Amendment for the reasons previously explained above regarding Plaintiff's Title VII claims. *See Shtino v. Aponte*, No. 93-CV-4617 (DLC), 1995 WL 396581, at *9 (S.D.N.Y. July 6, 1995) ("In addition to disposing of plaintiff's Title VII disparate treatment claim, this discussion also disposes of plaintiff's claims asserted under . . . the Fourteenth Amendment . . . . Each of these causes of action must be based on intentional discrimination[.]"). Additionally, the Court notes – and finds it telling – that Plaintiff does not even address or defend this cause of action in his opposition. *See* Pl.'s Opp. 8-14.

### D. Thirteenth Amendment Claim

Plaintiff's complaint also includes a cause of action for discrimination under the Thirteenth Amendment. Plaintiff's allegations are essentially verbatim to his Fourteenth Amendment claim, asserting that "Defendant CORRECTIONS . . . knowingly and/or with deliberate indifference for the rights of Plaintiff, discriminated against him when they filed and sustained frivolous charges against Plaintiff and failed to promote Plaintiff from probationary officer to officer." *Compare* Compl. ¶ 77-82 (Thirteenth Amendment claim), *with id.* at ¶ 83-88 (Fourteenth Amendment claim).

The Thirteenth Amendment provides that "[n]either slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction." U.S. Const. amend. XIII, § 1. The Supreme Court has referred to it as "an absolute declaration that slavery or involuntary

---

[9] Given that neither the complaint nor Plaintiff's opposition mentions a failure to promote Plaintiff to a detective position, the Court assumes that this allegation is a cut-and-paste or typographical error.

servitude shall not exist in any part of the United States." *Civil Rights Cases*, 109 U.S. 3, 20 (1883). Nothing in Plaintiff's complaint – which at most alleges that he was subject to frivolous charges, unfairly disciplined, and fired – touch on the Thirteenth Amendment's protection against involuntary servitude. Plaintiff has not asserted – nor does the Court believe that he could assert – that his work at DOC was involuntary, compelled, or coerced. Because "[t]he Thirteenth Amendment does not bar labor that an individual may, at least in some sense, choose not to perform, even where the consequences of that choice are 'exceedingly bad,'" *Immediato v. Rye Neck Sch. Dist.*, 73 F.3d 454, 460 (2d Cir. 1996) (citation omitted), Plaintiff's allegations do not give rise to a claim under the Thirteenth Amendment. *See Williams v. City of New York*, No. 99-CV-2697, 2006 WL 2668211, at *28 (E.D.N.Y. Sept. 11, 2006) ("Allegations of employment discrimination alone do not trigger Thirteenth Amendment concerns.").

### E. Retaliation

Plaintiff also alleges retaliation on the basis of race in violation of § 1981, which ensures that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." Section 1981 "outlaws discrimination with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship," including discrimination "giving rise to a hostile work environment." *Patterson*, 375 F.3d at 224, 226. The Second Circuit has held that "[m]ost of the core substantive standards that apply to claims of discriminatory conduct in violation of Title VII are also applicable to claims of discrimination in employment in violation of § 1981[.]" *Id.* at 225. Therefore, to the extent that Plaintiff alleges discrimination under § 1981 against the individual Defendants, this claim is dismissed for the same reasons as his Title VII claims.

## III.    Remaining State-Law Claims

Finally, Plaintiff alleges several violations of New York state and municipal law.  Federal

district courts have supplemental jurisdiction over non-federal law claims "that are so related to

claims in the action within such original jurisdiction that they form part of the same case or

controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).  A district

court, however, "may decline to exercise supplemental jurisdiction over a claim" once it "has

dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3).  "[I]n the

usual case in which all federal-law claims are eliminated before trial, the balance of factors to be

considered under the [supplemental] jurisdiction doctrine – judicial economy, convenience,

fairness, and comity – will point toward declining to exercise jurisdiction over the remaining

state-law claims." *Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 305 (2d Cir. 2003).  Generally,

"if a plaintiff's federal claims are dismissed before trial, the state claims should be dismissed as

well." *Brzak v. United Nations*, 597 F.3d 107, 113-14 (2d Cir. 2010) (citation omitted).

Here, declining jurisdiction over Plaintiff's state-law claims would not disserve the

principles of judicial economy, convenience, or fairness.  The Court has addressed and dismissed

each of Plaintiff's federal claims and done so early in the litigation.  *See Kolari v. New York-*

*Presbyterian Hosp.*, 455 F.3d 118, 123 (2d Cir. 2006) (reversing the district court's exercise of

supplemental jurisdiction because "Plaintiffs' federal-law claims were eliminated on a motion to

dismiss, prior to the investment of significant judicial resources").  Accordingly, the Court

declines to exercise supplemental jurisdiction here and thus does not address whether Plaintiff

has stated a claim for relief under state or municipal law.

**CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss is granted. Plaintiff will be given an opportunity to amend his complaint. Should he choose to do so, he shall file the amended complaint no later than February 28, 2020. The Clerk of Court is respectfully directed to terminate the motion pending at docket entry 10.

Dated:     January 30, 2020
            New York, New York

                                Ronnie Abrams
                                United States District Judge